FRIEDMAN, Circuit Judge.
 

 This is a suit by a government contractor in the United States Claims Court seeking damages for the alleged infringement of its patent by the United States. Under the government contract, pursuant to which the contractor developed the patented invention, the government had exclusive rights in any invention that was reduced to practice during the performance of the contract. The Claims Court held that the invention had been reduced to practice during the performance of the contract and dismissed the complaint.
 
 Hazeltine Corp. v. United States,
 
 10 Cl.Ct. 417, 230 USPQ 721 (1986). We affirm.
 

 I
 

 This case relates to United States Patent No. 3,836,977 (the ’977 patent), entitled “Antenna System Having A Reflector With A Substantially Open Construction.” The appellant, Hazeltine Corporation (Hazel-tine), seeks “reasonable and entire compensation,” pursuant to 28 U.S.C. § 1498 (1982), for the alleged unauthorized use by the United States of antennas that infringed the ’977 patent. The accused antennas are used in the Air Traffic Control Radar Beacon System (ATCRBS or Beacon System) operated by the Federal Aviation Administration (Administration). Indeed, “the only commercial application of the ’977 patent appears to be for ATCRBS antennas.” 10 Cl.Ct. 439, 230 USPQ at 737.
 

 A. In late 1971, Hazeltine engineers began studying new approaches to improving the performance of the Beacon System. They wanted to create an “open array” device with “high reflectivity” that would minimize “wind loading” while enhancing “backlobe suppression.” The engineers consulted with Hazeltine’s Dr. Wheeler, who suggested a design solution that he believed would achieve those objectives. The Claims Court found that “[t]he ’977 patent embodies Wheeler’s conception, which was the subject of Hazeltine Patent Department Docket R3909. Neither [of the Hazeltine engineers] was able to predict confidently that the open array design proposed by Wheeler would satisfactorily solve the ATCRBS problem.” 10 Cl.Ct. at 422, 230 USPQ at 724.
 

 The engineers built and tested a model that reflected Dr. Wheeler’s suggestions.
 
 *1192
 
 The model consisted of a flat aluminum surface 130 inches wide by 43.7 inches high, with an opening 31.6 inches wide by 21.2 inches high.
 
 See
 
 10 Cl.Ct. at 464-65 (photographs of precontract test model). The opening contained three “tuned reflectors” and five “conductive columns,” made of wooden dowels and aluminum tape, with a single monopole antenna element, all of which “only represented a small segment of a proposed open array antenna.” 10 Cl.Ct. at 422, 230 USPQ at 724.
 

 “The results of the tests on the experimental model convinced the involved engineers at Hazeltine that they had a viable solution to the ATCRBS problem. Indeed, Hazeltine planned to propose a tuned reflector antenna in response to an RFP [Request For Proposals] that they anticipated would be forthcoming from TSC [Transportation Systems Center of the Department of Transportation].” 10 Cl.Ct. at 425, 230 USPQ at 726. There was no further testing of the Wheeler invention before Hazel-tine began performance of the contract with the government.
 

 B. In September 1972, the Transportation Systems Center (Center) issued a Request for Proposals (Request) to 21 companies, including Hazeltine, soliciting proposals for an “Air Traffic Control Radar Beacon System Modification Kit.” The closing paragraph of the Request transmittal letter stated:
 

 Your attention is invited to the fact that the Contracting Officer is the only individual who can legally commit the Government to the expenditure of public funds in connection with this proposed procurement.
 

 The letter was signed “Daniel J. Kelle-her/Contracting Officer.” The Claims Court found that, “as an experienced government contractor, Hazeltine should have known that Kelleher was to be the [Contracting Officer], and there was some testimony that some members of Hazeltine did in fact know.”
 
 Id.
 
 The Request defined “Contracting Officer” to include “the authorized representative of a Contracting Officer acting within the limits of his authority.”
 
 Id.
 

 The Request stated that the contract would include the “Patent Rights (Title)” provision required in such contracts under 41 C.F.R. § 12-9.6102(c) (1973; effective date of regulation was March 12, 1972,
 
 see
 
 37 Fed. Reg. 4,802 (1972)). That provision states in pertinent part:
 

 (a) Whenever any invention, improvement, or discovery (whether or not patentable) is made or conceived or for the first time actually reduced to practice, by the Contractor or his employees, in the course of, in connection with, or under the terms of this contract, ... the Secretary shall have the sole and exclusive power to determine whether or not and where a patent application shall be filed, and to determine the disposition of all rights in such invention, improvement or discovery, including title to and rights under any patent application or patent that may issue thereon____
 

 (e) Whenever any invention, improvement, or discovery relating to the work called for or required under this contract is constructively reduced to practice by the Contractor or his employees, during the period of performance of the contract, there shall be a prima facie presumption that such invention, improvement, or discovery was conceived or first actually reduced to practice in the course of, in connection with, or under the terms of this contract____
 

 10 Cl.Ct. at 425-26, 230 USPQ at 726-27.
 

 Hazeltine submitted two proposals, one of which (“Volume II”) the Center selected for negotiation. There ensued extensive correspondences, conversations, and meetings between members of the negotiation teams of the Center and Hazeltine.
 

 Throughout the negotiations Hazeltine sought “[acknowledgment of the fact that Hazeltine has reduced the invention to practice,” while the Center insisted that, if the invention already had been reduced to practice, “the Patent Rights clause is self-deleting as to the invention because it does not apply to any invention which [sic] has actually been reduced to practice prior to the execution of a contract.” 10 Cl.Ct. at
 
 *1193
 
 427-28, 230 USPQ at 728. The Center’s patent counsel consistently “refused to formally acknowledge whether or not a reduction to practice had actually taken place.” 10 Cl.Ct. at 429, 230 USPQ at 729. The Claims Court found
 

 that no government personnel witnessed the tests conducted by Hazeltine and upon which plaintiff rests its claim that its invention had been reduced to practice. At best, the only possible indication the government had of plaintiff's invention was contained in its Volume II proposal in response to the ’070 RFP. A reasonable reading of the record convinces the court that any reduction to practice statements in the various government documents had their origin in plaintiff’s repeated self-serving assertions that its open array antenna idea had been reduced to practice. There is no credible evidence in the record as to how government personnel would have known of such a reduction to practice other than being told it was so by plaintiff’s personnel or by discerning same from plaintiff’s Volume II proposal. There is no persuasive evidence in the record which would support a finding that government personnel were persuaded by plaintiff’s Volume II proposal that its open array antenna had been reduced to practice.
 

 10 Cl.Ct. at 430, 230 USPQ at 730. During the negotiations, Hazeltine never communicated directly with Kelleher, the Contracting Officer.
 

 Hazeltine prepared a letter to the Center dated March 6, 1973, which requested that any contract with it include either an exclusion from the standard patent rights clause or an acknowledgment that the open array antenna had already been reduced to practice. The letter was not sent, and the file copy had a written notation that the letter was “cancelled as a result of Tedford’s telecon with DOT wherein the C.O. refused H’s request set forth in the attached letter.” 10 Cl.Ct. at 429, 230 USPQ at 729. Instead, Hazeltine sent a letter to the Center dated March 8, 1973, which stated:
 

 Pursuant to [a recent conversation between Hazeltine and government representatives], Transportation System Center has acknowledged that the subject matter of Hazeltine’s Docket No. R3909, entitled “Open Array Antennas,” ... has been reduced to practice by Hazeltine with in-house funds and is, therefore, not covered by the “Patent Rights” clause.
 

 10 Cl.Ct. at 429, 230 USPQ at 729-30. There is no indication that the Center answered this letter. Hazeltine received the proposed contract (the ’598 contract) “[sjubsequent to March 20, 1973,” signed the contract on April 3, 1973, and returned it to the Center. The contract contained all of the standard provisions, including the Patent Rights clause and the following provisions:
 

 The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein.
 

 INTERPRETATION OR MODIFICATION
 

 No oral statement of any person, and no written statement of anyone other than the Contracting Officer, or his recognized representative ..., shall modify or otherwise affect any provision of the contract.
 

 10 Cl.Ct. at 431, 230 USPQ at 730-31. The Claims Court “noted that the contract made no mention either of an exclusion from the Patent Rights clause or of any agreement that the open array antenna had been reduced to practice.” 10 Cl.Ct. at 431, 230 USPQ at 730.
 

 The Contracting Officer, Kelleher, signed the ’598 contract on or about April 25, 1973. The parties stipulated that Hazeltine actually began contract performance on March 21, 1973, for which Hazeltine was paid under the contract.
 

 The court described the contract as follows:
 

 The ’598 contract was a cost-plus-fixed-fee contract. The court believes it is fair to characterize this contract, at least the
 
 *1194
 
 Phase I portion, as a research and development type contract. The ’598 contract called for Hazeltine,
 
 inter alia,
 
 to “conduct a comprehensive, detailed, engineering study of the ... ATCRB [sic] interrogator installation, and concurrently, design [a four-foot-high open array antenna] in accordance with [Hazeltine’s Vol-. ume II proposal and the design constraints of the ’070 RFP ...].
 

 10 Cl.Ct. at 431-32, 230 USPQ at 731.
 

 The court further stated:
 

 The ’598 contract had two phases. As described by Tedford, Phase I was a “study” phase, whereas Phase II, which was optional with the government, was a “hardware” phase. Francis J. LaRussa (LaRussa), one of the government’s expert witnesses, was technical monitor on the ’598 contract. He described Phase I as “study and preliminary design,” with Phase II being to “design and build and test the antenna” if the results of Phase I proved satisfactory.
 

 10 Cl.Ct. at 432, 230 USPQ at 731.
 

 “Design review meetings” were held between Hazeltine engineers and LaRussa, on May 3,1973 and June 22,1973, at which a number of technical problems and possible solutions were discussed.
 

 Hazeltine filed the patent application for the ’977 patent on June 25, 1973. The patent issued on September 17, 1974.
 

 Effective August 3, 1973, the government exercised its option for Phase II of the contract, which called for the design, construction, and delivery of a full-scale prototype of the open array antenna. Ha-zeltine completed construction of the prototype in January 1974, and tested it in various settings over the succeeding months.
 

 Despite some problems, the test results were sufficiently favorable to lead the government to award a contract to Hazel-tine to deliver ten more of the antennas. Hazeltine was also awarded a subsequent contract to implement further improvements of the open array antennas. Both of these contracts were “sole source” contracts, awarded to Hazeltine because of its expertise with respect to the subject antenna.
 

 The government subsequently conducted competitive bidding for the supply of a substantial number of the Beacon System antennas. Hazeltine was not awarded that contract.
 

 The Claims Court found that, overall, Hazeltine “did not invest more than $20,-000, including salaries and overhead, in its precontract work relative to the tuned reflector open array antenna,” while Hazel-tine expended $398,000 under the ’598 contract, for which the government paid it. 10 Cl.Ct. at 436, 230 USPQ at 735.
 

 Hazeltine’s suit against the government is based upon the government’s purchase of antennas under contract from Texas Instruments and Radiation Systems, Inc. Hazeltine alleges those antennas infringe the ’977 patent.
 

 C. As the Claims Court noted, “the critical issue in this case is whether the government has a right, under the Patent Rights clause of the ’598 contract, to procure and use the subject antennas, which plaintiff claims are covered by the ’977 patent, without liability to Hazeltine.” 10 Cl.Ct. at 439, 230 USPQ at 737. In a lengthy opinion the court ruled that “the subject of the ’977 patent was first reduced to practice during the ’598 contract as maintained by” the government, so that the government had unfettered right to use the invention. 10 Cl.Ct. at 419, 230 USPQ at 721.
 

 II
 

 Hazeltine contends that the government is equitably estopped to deny that the open array antenna had been reduced to practice prior to the execution of the ’598 contract because, during the negotiations leading to the contract, the government had agreed that there had been a reduction to practice.
 

 In its opinion, the Claims Court meticulously reviewed the extensive documentary and testimonial evidence regarding the precontract negotiations and discussions, and concluded that the government had not
 
 *1195
 
 agreed that the invention had been reduced to practice. We agree.
 

 In order to establish an estoppel, Hazel-tine was required to show that: (1) the government believed that it had expressed agreement with Hazeltine that there had been a reduction to practice, (2) the government intended Hazeltine to enter into the contract in reliance on that agreement, (3) Hazeltine did not know the true facts,
 
 i.e.,
 
 that the government did not agree that the invention had been reduced to practice, and (4) Hazeltine must have relied on the government’s conduct to its detriment.
 
 American Elec. Laboratories v. United States,
 
 774 F.2d 1110, 1113 (Fed.Cir.1985). All four of these elements must be present to establish estoppel. The Claims Court found that none of them existed. 10 Cl.Ct. at 442-43, 230 USPQ at 739-41.
 

 We agree with the Claims Court that Hazeltine did not establish that during the precontract negotiations the government believed that it had expressed agreement that there had been a reduction to practice. Since our affirmance of that determination is sufficient to uphold the Claims Court ruling that there was no estoppel, it is unnecessary to consider the other three elements of estoppel that the court also found lacking.
 

 Hazeltine in effect asks us to review the record
 
 de novo
 
 and to infer the existence of such an express agreement. We decline to do so, and instead review the Claims Court’s finding of no agreement to determine whether it is clearly erroneous under rule 52(a) of the Rules of the United States Claims Court. We cannot say that the record on this issue required the Claims Court to find that the government had agreed that there had been a reduction to practice.
 

 Indeed, even the item of evidence that Hazeltine contends most supports its position is ambiguous: the letter that Hazeltine sent to the Center (which Hazeltine now refers to as its “best and final offer”), asserting that the Center “has acknowledged that the [open array antenna] has been reduced to practice.” Page 1193,
 
 supra.
 
 The Claims Court declined to infer from the Center’s failure to respond that the government thereby acquiesced in Ha-zeltine’s statement of the government’s position. The court’s action constituted an appropriate weighing of the evidence, and we may not substitute our judgment for that of the trial court.
 
 Anderson v. City of Bessemer City,
 
 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).
 

 The weakness of Hazeltine’s argument is highlighted by contrasting this case with
 
 Bendix Corp. v. United States,
 
 600 F.2d 1364, 220 Ct.Cl. 507, 204 USPQ 617 (1979), where the contractor had
 

 rejected the boiler-plate patent rights article proposed by [the government] and, after many months of negotiation, the parties reached an agreement on terms that were precisely the same as those demanded by [the contractor] when it rejected [the government’s] original proposal. [The government’s] contention that, notwithstanding these facts, [the contractor] somehow is bound by [the government’s] original proposal is simply incomprehensible.
 

 Id.,
 
 600 F.2d at 1372, 220 Ct.Cl. at 519, 204 USPQ at 623. In that case, the contractor’s insistence resulted in the following language in the contract:
 

 ... the power control disclosed in the attached blueprints ... and all inventions, improvements, and discoveries embodied therein are deemed to have been heretofore actually reduced to practice, and the expression “Subject Invention” ... shall be construed to exclude any of such inventions, improvements and discoveries.
 

 Id.,
 
 600 F.2d at 1371, 220 Ct.Cl. at 518, 204 USPQ at 622.
 

 Here, Hazeltine also had sought such a provision, but in the negotiations it ultimately accepted the standard contract language, despite its position that there had been a reduction to practice. In such circumstances, we agree with the conclusion of the Claims Court that
 

 there was no agreement between the parties or acknowledgement by the government regarding reduction to practice. Assuming such an agreement could be
 
 *1196
 
 found, the court holds that the facts are otherwise insufficient, as a matter of law, to estop the government from contesting the bona fides of such an agreement. Plaintiff is and was an experienced government contractor and had its patent staff involved in this matter throughout the negotiation process. Whether consciously or not, plaintiff did not insist on an inclusion of the alleged agreement in the ’598 contract. The court will not, on the record before it, do now for plaintiff what plaintiff attempted to do before it executed the ’598 contract. The court does not believe that equitable considerations support plaintiff’s position quite apart from the legal deficiencies of its position.
 

 The most that can be said for the pre-contract negotiations is that each party tended to play its cards close to its chest. Both parties recognized the import and impact of the Patent Rights clause on the matter at hand. Each, represented by patent counsel, signed the ’598 contract, with said clause contained therein and no exclusion from its coverage or reach provided.
 

 10 Cl.Ct. at 444, 230 USPQ at 741 (citation and footnote omitted).
 

 Ill
 

 Under the ’598 contract, the government had the exclusive right "to determine the disposition of all rights” in any invention reduced to practice under the contract—including the right to grant itself an exclusive, royalty-free license. Furthermore, the constructive reduction to practice of an invention during the performance of the contract created a “prima facie presumption that such invention ... was conceived or first actually reduced to practice in the course of” the contract.
 

 Hazeltine filed the application that ripened into the ’977 patent on June 25, 1973, three months after it began work under the ’598 contract. As the Claims Court held, the filing of a patent application is a constructive reduction to practice. 10 Cl.Ct. at 446, 230 USPQ at 742;
 
 see, e.g., In re Katz,
 
 687 F.2d 450, 454, 215 USPQ 14, 17 (CCPA 1982);
 
 Pacific Technica Corp. v. United States,
 
 11 Cl.Ct. 393, 428 (1986);
 
 see also
 
 3 D. Chisum,
 
 Patents
 
 § 10.05 (1986). Under the ’598 contract, therefore, there was a prima facie presumption of reduction to practice during performance of the contract, which Hazel-tine had the burden to overcome by proving that the tuned array antenna was
 
 not
 
 for the first time actually reduced to practice during the contract. 10 Cl.Ct. at 446, 230 USPQ at 742. The Claims Court held Ha-zeltine failed to carry that burden. We agree.
 

 In the context of a patent rights clause in a government contract, “[rjeduction to practice occurs when it is established that the invention will perform its intended function beyond a probability of failure,”
 
 McDonnell Douglas Corp. v. United States,
 
 670 F.2d 156, 161, 229 Ct.Cl. 323, 214 USPQ 857, 860 (1982), so that whatever “minor adjustments” are thereafter required may be considered mere “perfecting modifications.”
 
 Bendix,
 
 600 F.2d at 1371, 220 Ct.Cl. at 518, 204 USPQ at 622.
 

 The principal issue is whether prior to execution of the contract there had been a reduction to practice of the embodiment of the invention that claim 1 covers, through the construction of the precontract experimental model described at the outset of this opinion. As the Claims Court pointed out, Hazeltine “proposed no findings supporting a reduction to practice of claims 2-13....” 10 Cl.Ct. at 448, 230 USPQ at 744. The court also noted that “Claims 2-12 require,
 
 inter alia,
 
 ‘a plurality of ... antenna elements for radiating wave energy ... ’; claim 13 is literally worded differently, but has essentially the same limitations. In claims 6 and 13, the antenna elements are specified as dipoles; in the other claims they are simply 'linearly polarized.’ ” Although Hazeltine contends that the embodiments of the invention in claims 2-13 were reduced to practice because the precontract model was “equivalent in structure to the structure defined by claims 2-13,”
 
 id.,
 
 we need not consider that argument because we agree with the court that
 
 *1197
 
 not even the embodiment in claim 1 was reduced to practice prior to execution of the '598 contract.
 

 The Claims Court stated:
 

 There remains for consideration whether the first experimental model could have served as a reduction to practice of claim 1 of the ’977 patent. Claim 1 requires,
 
 inter alia,
 
 “a reflector with an open construction” and “at least one linearly polarized antenna element for radiating wave energy, arranged with the polarization of said element substantially parallel to [the] columns” and with the location of the tuned arrays “selected to cause suppression of leakage of said radiated wave energy.”
 

 10 Cl.Ct. at 449, 230 USPQ at 745. The court thoroughly analyzed all the evidence relating to the testing of the precontract model, and found
 

 that claim 1 of the ’977 patent, insofar as it relates to a linearly polarized antenna element and suppression of radiation leakage therefrom, reads upon the first experimental model. However, the use of the monopole, and the circumstances of its use, in the testing of the precon-tract experimental model weaken plaintiff's claim that the invention had been reduced to practice as a result of such tests.
 

 All of the experts at trial agreed that the precontract test model could not properly be characterized as open. They further agreed that the test results reflected the performance of the entire structure, not just the opening____
 

 ... [T]he size of the opening in the precontract test model ... was not large enough to demonstrate that any observed suppression was due to resonance of the tuned rods____
 

 The court finds that ... the available patterns did not demonstrate that the tuned reflector itself provided suppression of radiation____ Accordingly, on the facts presented, the court is unable to find that the efficacy of the tuned reflector concept was shown beyond a probability of failure on the basis of tests which merely showed that a large metal sheet containing a relatively small section of tuned array ... performed better than a solid sheet of the same gross dimensions.
 

 10 Cl.Ct. at 450-55, 230 USPQ at 746-50. Hazeltine has not shown that any of these findings is clearly erroneous.
 

 Hazeltine criticizes the court’s reliance upon expert testimony, arguing that it should be dispositive that “[t]he evidence at trial demonstrated that the contemporaneous evaluation of Hazeltine’s precontract tests convinced the involved engineers that the Wheeler invention had been reduced to practice.” The question, however, is not whether those engineers believed that the invention had been “reduced to practice”— which is a legal conclusion—but whether the invention would “perform its intended function beyond a probability of failure.”
 
 McDonnell Douglas, supra.
 
 We agree with the Claims Court that the repeated assertions by Hazeltine’s engineers at the testing stage of the experimental model that the antenna had been “reduced to practice” reflect mainly their wish to exclude the antenna from the patent rights clause.
 

 Hazeltine’s contention is further weakened by the type of contract that Hazeltine entered into with the government. An invention that has been reduced to practice— that will “perform its intended function beyond a probability of failure”—is immediately ready to be adapted for practical use. A contractor with such an invention therefore would reasonably seek a contract with the government for the production of a working prototype,
 
 see, e.g., Bendix,
 
 600 F.2d at 1371, 220 Ct.Cl. at 518, 204 USPQ at 622;
 
 Lockheed Aircraft Corp. v. United States,
 
 553 F.2d 69, 89, 213 Ct.Cl. 395, 431, 193 USPQ 449, 466 (1977);
 
 Eastern Rotocraft Corp. v. United States,
 
 384 F.2d 429, 431, 181 Ct.Cl. 299, 155 USPQ 729, 731 (1967);
 
 Farrand Optical Co. v. United States,
 
 325 F.2d 328, 329, 139 USPQ 249, 250 (2d Cir.1963), or at the very least would file a patent application.
 
 Cf. Pacific Technica Corp. v. United States,
 
 11 Cl.Ct. 393,
 
 *1198
 
 428 (1986) (government prevails because actual reduction to practice occurred during performance of contract, even though application filed before contract).
 

 The ’598 contract had two phases. Phase I, which the Claims Court characterized as a research and development contract, was viewed as a “study” and “preliminary design phase.” Phase II, which would be pursued only if Phase I was successful, involved the design, construction, and testing of the antenna. Because of the development that this project took, with a first stage intended merely to establish feasibility, it is inconsistent with Hazeltine's contention that at the time the contract was executed, the invention had been reduced to practice. 10 Cl.Ct. at 459 n. 38, 230 USPQ at 752 n. 38;
 
 see, e.g., McDonnell Douglas,
 
 670 F.2d at 158, 229 Ct.Cl. at 324, 214 USPQ at 858. Certainly the government did not believe at that time that Hazeltine already had a fully realized working solution to the problem the Request for Proposals addressed, since that would have made Phase I unnecessary. Indeed, “it was only after the development work was done under Phase I of the ’598 contract that the government agreed, in Phase II, to purchase an actual open array antenna.” 10 Cl.Ct. at 459, 230 USPQ at 753.
 

 Furthermore, performance of Phase I of the ’598 contract demonstrated that, regardless of the precontract perceptions of the parties’ engineers, the open array antenna had not actually been reduced to practice by the precontract model. Significant problems arose during Phase I, which were solved only after several design review meetings and extensive modification and testing of a 4-by-8-foot open array test model.
 
 See
 
 10 Cl.Ct. at 467 (photograph of contract test model). The necessity of solving these problems, which Hazel-tine’s engineers had not anticipated from the results of testing the crude precontract model, severely weakens the probative value of those engineers’ precontract perceptions of the stage of the invention’s development.
 
 See McDonnell Douglas,
 
 670 F.2d at 163, 229 Ct.Cl. at 332, 214 USPQ at 861-62;
 
 Leesona Corp. v. United States,
 
 530 F.2d 896, 910, 208 Ct.Cl. 871, 894, 185 USPQ 156, 167 (1976).
 

 CONCLUSION
 

 The judgment of the Claims Court dismissing the complaint is affirmed.
 

 AFFIRMED.