**Anita ERWIN, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 475–87C.

United States Claims Court.

Dec. 13, 1989.

Daniel C. Masten, Nashville, Tenn., for plaintiff. Frank E. Clayton, of counsel.

Hillary A. Stern, Washington, D.C., with whom were Asst. Atty. Gen. John R. Bolton, Asst. Director David M. Cohen, and Asst. Director Thomas W. Petersen, for defendant. David Weiskopf, Administrative Office of the U.S. Courts, of counsel.

OPINION

LYDON, Senior Judge:

 This service contract case[1] comes before the court on defendant's motion for summary judgment, or in the alternative,

1. Since this contract involves the judiciary, the Contract Disputes Act is not for application. 41 U.S.C.A. § 601, *Historical And Statutory Notes* (West 1987).

for partial summary judgment.[2] Plaintiff opposes defendant's summary judgment motion on the ground that genuine issues of material fact are in dispute. Upon consideration of the submissions of the parties and oral argument, the court concludes that defendant's motion for summary judgment must be granted in part and denied in part.

### Facts

Plaintiff Anita (Brady) Erwin is sole owner of the court reporting firm Brady & Brady, having succeeded to the interest of her partner and husband, Don Brady, now deceased. The relevant events leading up to the commencement of the three contracts in dispute are as follows.

On February 3, 1984, the United States Bankruptcy Court for the Middle District of Tennessee, by and through its Clerk Maurine D. Neel (Neel), sent a letter to Paul R. Tuell (Tuell), Chief of Procurement and Property, Management Branch, Administrative Office of the United States Courts (AO), requesting authorization to purchase electronic sound recording (ESR) equipment for bankruptcy court proceedings. In her letter, Neel provided two reasons for the requested purchase. First, she cited the unsatisfactory contract court reporting system currently in use, noting in particular the problem of acquiring court reporters who meet the quality standards set forth in the contracts. Second, she cited the superior cost effectiveness of the ESR equipment over the present contract system. Neel stated at the end of the letter that the court "would like to have the equipment installed at the latest by June 5, 1984, when the present court reporter contracts expire." The contracts to which Neel referred were then held by Brady & Brady. These contracts, which were pro-

cured annually, are not the subject of the present dispute.

Neel received a response to her letter on March 7, 1984 from Rick McBride (McBride), Special Projects Director for the Office of Court Reporting and Interpreting Services of the AO. The letter informed Neel that at present there were no funds available for the purchase of ESR equipment for use in the bankruptcy courts. However, funds had been requested for fiscal year 1985, and therefore might become available on October 1, 1984, subject to Congressional approval.

In May 1984, in contemplation of submitting a bid, plaintiff (or her husband) asked Neel about the meaning of the "Scope of Agreement" provision contained in paragraph 2(b) of Government Form AO–358, the court reporting services contract. This provision provides that "[a]ny proceedings which the Government determines to record on electronic sound recording equipment, such as meetings of creditors conducted pursuant to provisions of the Bankruptcy Code, title 11, United States Code, or not to report are outside the scope of this Agreement." Plaintiff contends that in order to induce Brady & Brady to bid upon the defendant's solicitation of offers, Neel represented that the above provision was limited solely to non-judicial proceedings. Plaintiff contends that Brady & Brady would not have made an offer on the solicitation in 1984 were it not for Neel's representation. Plaintiff's offer led to the award of court reporting and transcription services contracts which began on or about June 5, 1984 and ended on or about June 4, 1985. There is no dispute that these contracts were fully performed and these contracts are not at issue in this case. It is also reasonable to assume that funds for ESR equipment were not available for fiscal year 1985.

---

**2.** Defendant's motion for summary judgment is based on the contention that plaintiff breached the three service contracts in issue and thus is not entitled to damages for breach of contract. Defendant also argues, in response to plaintiff's contention that defendant breached the contracts in issue, that defendant's refusal to utilize plaintiff's services constituted a termination of the contracts for the government's convenience

and thus precludes any damages for breach of contract. In its alternative motion for partial summary judgment, defendant contends that plaintiff, in any event, cannot recover any damages subsequent to October 17, 1985, when defendant put into operation electronic sound recording equipment, because this method of reporting court proceedings was outside the scope of the contracts.

Since plaintiff's one year contracts to furnish court reporting and transcription services were due to expire on or about June 5, 1985, on April 22, 1985, defendant again issued a solicitation of offers to furnish court reporting and transcription services for bankruptcy courts at three Tennessee locations: Columbia, Cookeville, and Nashville. Brady & Brady again submitted offers, dated April 24, 1985, to furnish court reporting and transcription services at all three locations. On April 26, 1985, Neel submitted a written request for the services of two ESR operators for bankruptcy judges for fiscal year 1986, which was to commence on October 1, 1985. On May 1, 1985, Neel also submitted a written request to procure the court reporting services of Brady & Brady from June 13, 1985 to June 12, 1986 at the three locations, listed above, as provided in the contracts.

On May 1, 1985, defendant issued a "Court Reporting Services Evaluation and Recommendation Record." This Record recommended that Brady & Brady be awarded the three contracts, discussed above, for the following reasons: theirs was the only bid submitted, the qualifications of the reporters "are as required," and "the court has been well satisfied with these reporters." On May 29, 1985, plaintiff's husband Don Brady received three letters from Tuell stating that Brady & Brady had been awarded the three court reporting services contracts for Columbia, Cookeville and Nashville, and that the effective contract period was June 13, 1985 through June 12, 1986. The contracts were numbered USCA 50619, 50621, and 50622 (1985 contracts). These 1985 contracts also contained the ESR scope of agreement exception which was part of the 1984 contracts. It would appear that the AO was optimistic about obtaining funds for ESR equipment for fiscal year 1986, which would commence on October 1, 1985.

There is little question that these contracts are in the nature of requirements contracts. Government Form AO–351, entitled "Preparation Instructions—Offers to Furnish Court Reporting Services" provides in paragraph 13 that "[t]he resulting Agreement will constitute a requirements contract, and the Government agrees to obtain all services within the scope of the resulting Agreement from the successful offeror." Moreover, in Government Form AO–357, entitled "Offer to Furnish Court Reporting Services," plaintiff agreed to "provide services to satisfy—all of the needs of presiding officials within the scope of this Solicitation." "Under a requirements contract, the Government promises to purchase all of its requirements for the services or materials specified in the contract." *Biener GmbH v. United States,* 17 Cl.Ct. 802, 809 (1989).

Each of these contracts also contained a "termination for convenience" clause, which provides in pertinent part:

> The Contracting Officer, by written notice, may terminate this agreement, in whole or in part, when it is in the best interest of the Government. The Government shall be liable only for payment in accordance with the payment provisions of this agreement for performance which the contractor renders prior to the effective date of termination.

Plaintiff contends that, as a result of prior dealings, defendant, through its agent Neel, knew or should have known, prior to the award of the 1985 contracts, that Don Brady had been experiencing serious health problems since the winter of 1984, and had been diagnosed as having cancer no later than April 1985. Plaintiff submitted the affidavit of James D. Lane, II (Lane) in support of this contention. Lane was the Courtroom Deputy for Chief Judge Paine in the Bankruptcy Court for the Middle District of Tennessee until September 30, 1985. One of his duties as Deputy was to issue Reporting Services Orders (RSOs) each Friday to notify Brady & Brady of the need for court reporting services for the following week. Lane stated that he first became aware of Don Brady's serious health problems in the winter of 1984, and that his illness had been diagnosed as cancer no later than April 1985. He also stated that information regarding the nature of Don Brady's illness was avail-

able to bankruptcy court employees before May 29, 1985.

Defendant submitted the affidavit of Mary Dolce, who was the Courtroom Deputy for Chief Judge Paine during the term of plaintiff's 1985 contracts. She stated that Don Brady became unable to perform the contracts in June 1985 because he had cancer, and that she was aware of his illness because she was in the hospital at the same time he was in June 1985, and they had discussed it then. The significance of the awareness of the illness of Don Brady by government personnel before the award of the contracts in question is not readily apparent. Brady & Brady would be required to satisfactorily perform the contracts it entered into regardless of the health and well-being of its owners.

On June 3, 1985, McBride sent a letter to Neel confirming arrangements for a site assessment on June 20, 1985 in preparation for the installation of ESR systems for Bankruptcy Judges Paine and Lundin.

On June 25, 1985, Neel received a letter from McBride authorizing her to hire two full-time ESR operators to record courtroom proceedings conducted by Judges Paine and Lundin. The letter noted that the position of ESR operator is classified as JSP 4–5–6–7. Plaintiff contends that such position entails the same or substantially similar duties ("log the proceedings for the accurate production of transcripts") as those required under the contracts ("furnish Reporting Services and Transcription Services") between plaintiff and defendant.[3]

On July 8, 1985, Neel submitted a written request to procure ESR systems for Judges Paine and Lundin. The total estimated cost was $22,602.

On August 5, 1985 McBride sent a letter to Neel discussing in detail the ESR equipment installation proposal, including an estimated cost of $22,432.00, and including plans for ESR operator training.

Neel responded by letter two days later, on August 7, 1985, stating that two ESR operators, both full-time court employees, had been selected.

Plaintiff contends that on or about August 7, 1985, she first learned of defendant's plans to install ESR systems in the bankruptcy courtrooms. However, as indicated above, plaintiff was aware as far back as 1984 of the AO's intent to utilize ESR equipment in bankruptcy proceedings, thereby performing such services "in-house." Plaintiff contends that she met with Neel concerning these plans, and Neel suggested contacting McBride for further information.

Plaintiff sent a letter on August 7, 1985 to McBride expressing her interest in maintaining Brady & Brady's services to the court "by whatever method is to be installed," and if there was to be a contract for transcription services, Brady & Brady would like to bid or compete for this service. Plaintiff expressed some confusion as to whether Brady & Brady's three contracts already included transcription services. Plaintiff expressed no concern about the reporting function of the ESR program.

Neel responded to plaintiff's inquiry by letter dated August 21, 1985. Her letter merely acknowledged that plaintiff had expressed an interest in providing transcription services to the bankruptcy court when the ESR equipment was installed, and requested that plaintiff fill out a form to advise private parties ordering transcripts that plaintiff was available for transcription services.

The contracts in dispute contain a provision which sets forth the procedure defendant must follow each time it seeks to communicate its need for court reporting services to plaintiff:

REPORTING SERVICES

4. REPORTING SERVICES ORDERS

(a) The Contracting officer shall place orders for necessary reporting services

---

**3.** Ostensibly, under the ESR system both the reporting and transcribing functions were performed electronically. Therefore, plaintiff's contention that the ESR operators performed duties similar to those described in plaintiff's contracts may not be accurate, as the ESR operators presumably performed neither a reporting nor a transcribing function, but merely operated the machinery which performed both functions.

(a "Reporting Services Order" or "RSO") with the Contractor. The RSO shall specify the time and place at which the Contractor's reporter (the "Reporter") shall present himself to report the proceedings. The Contracting Officer shall issue each RSO under this Agreement so as to satisfy the Minimum Notice requirement, as defined in the Schedule. Although each RSO shall be in writing, the Contracting Officer may contact the Contractor orally to satisfy the Minimum Notice requirement, and the Contractor agrees to consider such oral contact as sufficient notice, provided it is timely.

The "Schedule" referred to in the above provision is contained in plaintiff's Offer to Furnish Court Reporting Services, and specifies a twenty-four hour minimum notice requirement.

Plaintiff contends that in early August 1985 she began to have difficulty communicating with the court regarding the need for court reporting services, and such difficulty coincided with the departure of Courtroom Deputy Lane. Prior to Lane's departure, written RSOs were issued each Friday for the court's reporting requirements for the following week. After his departure, written RSOs were not issued, and oral RSOs were issued in violation of the contracts' twenty-four hour minimum notice requirement. Plaintiff contends that she nevertheless made every effort to comply with the oral RSOs, despite the short notice, and that she made every effort to remedy promptly any and all performance deficiencies that were brought to her attention by defendant's agents. The court notes that deficiencies in transcripts, which were a major complaint of two bankruptcy judges, were in no way related to alleged RSO violations.

Defendant contends that plaintiff's firm began to have difficulty performing the contracts shortly after their commencement in June 1985, and that plaintiff attributed such difficulties to her husband's illness. The fact that plaintiff was having problems performing the contracts is supported by a July 31, 1985 Order issued by Judge Lundin directing that no charge be made for transcripts of two July proceedings reported by plaintiff's firm, due to errors in the transcripts. In addition, a letter dated August 16, 1985 from Neel to plaintiff advised plaintiff of complaints regarding the transcript of a June 6, 1985 hearing in Judge Lundin's court. The transcript was signed by Winnie Guyer, a court reporter employed by Brady & Brady. The letter requested immediate correction of the transcript, and also stated that Judge Lundin was so displeased that in the future he did not want Winnie Guyer reporting any hearing in his court.

Defendant does not dispute that it began to order court reporting services from other court reporters and ceased to use the services of plaintiff's firm in late August 1985. Furthermore, defendant admits that it ceased ordering any court reporting or transcription services from anyone after the ESR equipment was installed in the bankruptcy court on October 17, 1985. Defendant also admits that it gave plaintiff no written notice of termination of the contracts. Plaintiff admits that defendant paid Brady & Brady for all work actually performed under the contracts.

Plaintiff calculates that the total amount that defendant would have paid to plaintiff under the three contracts, if fully performed, is $40,382.47, according to the defendant's estimate of its needs. Plaintiff contends, however, that defendant would have required at least $50,000 worth of plaintiff's services, since, in plaintiff's past dealings with defendant, the court's reporting requirements had increased by twenty-five percent each year.

### Discussion

Summary judgment is appropriate only when there are no genuine issues of material fact, and the party moving for summary judgment is entitled to a judgment as a matter of law. RUSCC 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Beta Systems, Inc. v. United States*, 838 F.2d 1179, 1184 (Fed.Cir.1988); *Municipal Leasing Corp. v. United States*, 1 Cl.Ct. 771, 774 (1983). In deciding whether to

grant or deny a motion for summary judgment, the court must resolve all doubt respecting the presence or absence of factual issues in favor of the party against whom summary judgment is sought. *Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567, 1571 (Fed.Cir.1984).

This case involves a dispute over three identical one-year contracts to provide court reporting and transcription services covering three bankruptcy court locations in Tennessee: Columbia, Cookeville and Nashville. The term of these contracts extended from June 13, 1985 through June 12, 1986. It is established that these contracts were requirement type contracts.

Defendant began procuring court reporting and transcription services from other sources than plaintiff's firm in August 1985 after experiencing difficulties with Brady & Brady during the June–August 1985 period of contract performance. It is noted that plaintiff's performance of past service contracts was quite satisfactory.

On October 17, 1985 defendant began to use its newly-installed electronic sound recording (ESR) system to record courtroom proceedings and other bankruptcy proceedings, and thereafter ceased to procure court reporting and transcription services from *any* source. Defendant's actions in this regard led plaintiff to file the instant suit August 11, 1987, seeking damages for defendant's alleged breach of contract.

The primary issues to be resolved in this case are first, whether and when either party, or both, breached the contracts, the subject matter of defendant's total summary judgment motion; and second, whether the electronic recording of judicial proceedings is within or without the scope of the contracts, the subject matter of defendant's motion for partial summary judgment.

–A–

Plaintiff alleges that in August 1985 defendant begin obtaining court reporting services by using electronic sound recording equipment at the three bankruptcy court locations covered by the contracts. Plaintiff further alleges that defendant breached the contracts by ceasing to order court reporting services from Brady & Brady in August 1985, and by ceasing to order transcription services from Brady & Brady and contracting with other parties to provide such services in August or September 1985.

Defendant admits in its Answer that it ceased ordering court reporting services from Brady & Brady in August 1985, that it ceased ordering transcription services from Brady & Brady in August or September 1985, and that it contracted with other parties for transcription services in August or September 1985. Defendant denies that it began using electronic recording equipment in August 1985, and avers that although electronic sound recording equipment was tested in August and September 1985, it was not installed until October 1985.

Defendant advances several arguments in favor of its motion for total summary judgment. First, defendant alleges that plaintiff breached the contracts by failing to perform them, and such breach precludes any recovery of damages. Second, defendant argues that plaintiff should not recover any damages because the alleged failure to perform the contracts forced defendant to procure court reporting services elsewhere, and therefore defendant's refusal to order services from plaintiff was justified under the doctrine of constructive termination for convenience.

■ There is conflicting evidence on the issue of whether plaintiff breached the contracts. Defendant alleges that plaintiff breached them shortly after the contracts' term began to run on June 13, 1985, by failing to provide court reporting and transcription services according to the standards set forth in the contracts. Plaintiff admits to instances of substandard performance, but claims that such shortcomings do not amount to a breach, and, if they do, they were caused by defendant's failure to adhere to the contract terms. The issue of whether plaintiff breached the contracts is clearly a question of fact, and one that cannot be resolved by summary judgment

on the basis of the materials presently before the court.

The issue of whether, and when, defendant breached the contracts requires a more detailed inquiry. First, defendant admits that in August 1985 it procured court reporting and transcription services from other parties, and ceased ordering such services from Brady & Brady. Defendant claims this action was justified, however, because plaintiff's breach forced defendant to procure court reporting services elsewhere. This defense, of course, depends on the resolution of the question of whether plaintiff breached the contract.

Defendant also seeks to justify its August 1985 actions under the doctrine of constructive termination for convenience. The government's standard court reporting services contract contains a "termination for convenience" clause, which allows the government to terminate the contract, in whole or in part, "when it is in the best interest of the Government." The origin of the termination for convenience clause lies in the unpredictable nature of government wartime procurement. *Maxima Corp. v. United States*, 847 F.2d 1549, 1552 (Fed. Cir.1988). The government's right to terminate a contract when the other party has not breached was originally implemented to quickly terminate wartime production. *Id.* (citing *Torncello v. United States*, 231 Ct.Cl. 20, 681 F.2d 756 (1982)).

The broad language of the termination for convenience clause has been construed more narrowly in peacetime government procurement to apply "only where there [is] some change from the parties' original bargain and [is] not to be applied as broadly as an untutored reading of the words might suggest." *Torncello, supra*, 231 Ct.Cl. at 37, 681 F.2d at 766. *See also Municipal Leasing Corp. v. United States*, 7 Cl.Ct. 43, 47 (1984) (termination for convenience clause can only be invoked in event of changed circumstances from bargain or in parties' expectations); *G.C. Casebolt v. United States*, 190 Ct.Cl. 783, 421 F.2d 710 (1970) (termination for convenience is in Government's best interests when used to avoid possible rebuke by General Accounting Office); *Nesbitt v. United States*, 170 Ct.Cl. 666, 345 F.2d 583 (1965) (termination for convenience in Government's best interests when contractor unable to meet Government's needs expeditiously), *cert. denied*, 383 U.S. 926, 86 S.Ct. 931, 15 L.Ed.2d 846 (1966). These cases indicate that the purpose of the clause is to reduce government liability for breach of contract by allocating to the contractor a share of the risk of unexpected change in circumstances. *Maxima Corp., supra*, 847 F.2d at 1552.

Constructive termination for convenience is a judge-made doctrine that allows an actual breach by the government to be retroactively justified. *Maxima Corp., supra*, 847 F.2d at 1553. This doctrine applies in situations where the government stops or curtails a contractor's performance for reasons that are later found to be questionable or invalid. *Torncello, supra*, 231 Ct.Cl. at 25, 681 F.2d at 759. "Constructively, the clause can justify the government's actions, avoid breach and limit liability." *Id.* This doctrine originates from a Supreme Court decision which provides in essence that "actions by a contracting party may be supported at a later date by any reason that could have been advanced at the time of the actions, even though the party was not then aware of it." *Torncello, supra*, 231 Ct.Cl. at 25, 681 F.2d at 759 (citing *College Point Boat Corp. v. United States*, 267 U.S. 12, 45 S.Ct. 199, 69 L.Ed. 490 (1925)).

In *Torncello*, the Court of Claims limited the constructive termination for convenience doctrine by holding that the government may not reserve for itself "an unlimited right to escape its promises, as termination on knowledge acquired before the contract award surely is," since such a right would risk "violating one of contract law's most fundamental principles, that all contracts must be supported by consideration." *Torncello, supra*, 231 Ct.Cl. at 41, 681 F.2d at 768 (citing Nash & Cibinic, *Federal Procurement Law* 1115 (3d ed. 1980)).

In *Torncello*, the Navy accepted plaintiff's bid for pest control services with the

knowledge that a lower bid existed. After entering into the contract with plaintiff, the Navy subsequently ordered such services from the lower bidder, and never ordered them from plaintiff. The Court of Claims held that such breach by the government could not be justified under the doctrine of constructive termination for convenience, since the government knew of the lower bid at the time it awarded the contract to plaintiff. The court reasoned that since the government promised to turn to plaintiff for all its pest control needs, if the termination for convenience clause were construed to allow the government to completely escape the contract by ordering none, then there is no promise and the contract would fail for lack of consideration. *Torncello, supra,* 231 Ct.Cl. at 42, 681 F.2d at 769.

In this case, defendant seeks to justify its August 1985 actions by contending that it was forced to procure court reporting services elsewhere because plaintiff's firm was unwilling or unable to perform the contracts. Defendant supports this contention with evidence, in the form of court orders, which indicate that plaintiff's firm was providing substandard court reporting and transcription services in July 1985. Defendant alleges that it was not aware at the time it entered into the contracts that plaintiff's firm would be unable to perform the contracts, nor that plaintiff's husband was terminally ill. Defendant claims that these changed circumstances justify a constructive termination for convenience.

Plaintiff denies that Brady & Brady was unwilling or unable to perform the contracts, and she offers an affidavit stating that the quality of work performed under these contracts was substantially the same as that performed under prior contracts with defendant. Plaintiff also offers an affidavit to show that, if Brady & Brady did breach the contracts, such breach was caused by defendant's failure to adhere to the terms of the contracts.

■ The issue of whether changed circumstances justify defendant's August actions turns on whether plaintiff was unwilling or unable to perform the contracts, in

other words, whether plaintiff was in breach. Although plaintiff would not be able to recover breach damages other than payment for work actually performed if defendant's August actions are found to be a constructive termination for convenience, if on the other hand the court finds no constructive termination for convenience, plaintiff's damages are not so limited. *See Kalvar Corp. v. United States,* 211 Ct.Cl. 192, 204, 543 F.2d 1298 (F.E.1976) (under constructive termination for convenience doctrine, damages limited to provisions of termination for convenience clause), *cert. denied,* 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977). As noted above, this factual issue must be resolved through a full trial on the merits.

–B–

[5] The next issue is whether the electronic sound recording of judicial proceedings is within the scope of the court reporting service contracts in issue. This issue is the focus of defendant's motion for partial summary judgment. In her brief in opposition to defendant's motion for partial summary judgment, plaintiff contends that only the electronic recording of non-judicial proceedings are outside the scope of the contracts, otherwise defendant's promise to use Brady & Brady to fulfill its court reporting requirement would be illusory, and the contract would be void.

Defendant admits that it used no court reporting services after the ESR system was installed, but contends that the contracts provide that the electronic sound recording of *any* court proceeding is outside the scope of the contracts. This provision states: "Any proceedings which the Government determines to record on electronic sound recording equipment, such as meetings of creditors conducted pursuant to provisions of the Bankruptcy Code, title 11, United States Code, or not to report are outside the scope of this Agreement."

To support her contention that this provision applies only to non-judicial proceedings, plaintiff claims that defendant's agent Neel, a court clerk who was not the contracting officer, assured plaintiff that

this was true relative to the 1984 contracts. Plaintiff claims Brady & Brady would not have entered into the contracts but for this assurance.[4]

The issue of whether, and to what extent, electronic sound recordings of court proceedings are within or without the scope of the contracts is a matter of contract interpretation, a matter for the court to decide. *See Industrial Indem. Co. v. United States,* 14 Cl.Ct. 351, 356 (1988). Defendant contends that the language of the provision is clear on its face, and that it pertains to all court proceedings. Plaintiff, however, points to the language "such as meetings of creditors" contained in the provision in issue, to support her contention that defendant's agent assured her that the provision covers only non-judicial proceedings.

It should be recognized that the government may validly exclude some services from a requirements contract. *Biener, supra,* 17 Cl.Ct. at 809. The question in this case is whether the above cited language validly excludes plaintiff's services from the contracts at issue. A reasonable reading of the provision supports defendant's position. The provision states that "any proceedings" recorded on ESR equipment are outside the scope of the contracts.[5] Plaintiff reads the parenthetical "such as"

clause as limiting the broad "any proceedings" language. Such a reading is deemed unreasonable. Under the circumstances, a more reasonable reading of the "such as" clause is that it merely illustrates one type of proceeding that would be covered by the ESR program. See *Donovan v. Anheuser-Busch, Inc.,* 666 F.2d 315, 327 (8th Cir.1981), in which the Eighth Circuit explained that "[t]he phrase 'such as' is not a phrase of strict limitation, but is a phrase of general similitude indicating that there are other matters of the same kind which are not specifically enumerated by the standard," citing cases collected in 40A *Word and Phrases,* under "such as," at 50–51.[6]

The court concludes that the use of ESR equipment relative to bankruptcy proceedings at the three locations set forth in the contracts at issue was outside the scope of said contracts and thus said use did not constitute a breach of said requirements contracts. *See Biener, supra.* Accordingly, the only period for which plaintiff might recover damages is the period August–October 16, 1985.

–C–

In considering possible damages for the period August–October 16, 1985, the fol-

---

**4.** The parol evidence rule in this court provides that prior oral agreements are not admissible to vary or contradict the written terms of a contract. *See Hazeltine Corp. v. United States,* 10 Cl.Ct. 417, 442 (1986) ("prior oral agreement is invalid and unenforceable if it conflicts with or varies the terms of the written contract"), *aff'd,* 820 F.2d 1190 (Fed.Cir.1987); *DeBarros v. United States,* 5 Cl.Ct. 391, 395 (1984) ("parol evidence rule ... precludes the admission into evidence of any prior or contemporaneous agreements which modify or contradict a final written agreement"). *See also Prestex v. United States,* 3 Cl.Ct. 373, 378 (1983), *aff'd,* 746 F.2d 1489 (Fed.Cir.1984); *David Nassif Assocs. v. United States,* 214 Ct.Cl. 407, 419–20, 557 F.2d 249, 256 (1977). Since the alleged 1984 agreement between plaintiff and defendant's agent Neel contradicts the express written terms of the ESR exception in the subsequent 1985 contracts, the parol evidence rule operates to exclude such evidence.

**5.** A basic rule of contract interpretation is that "a contract must be read as a harmonious whole *with no words rejected or treated as meaningless." Systems Exploration, Inc. v. United States,*

8 Cl.Ct. 334, 337 (1985) (emphasis added). Plaintiff's interpretation would reject or treat as meaningless the phrase "any proceedings" in contravention of this rule.

**6.** A general rule of contract interpretation is that "words should be given their plain and ordinary meaning." *Cherry Hill Sand & Gravel Co. v. United States,* 7 Cl.Ct. 357, 360 (1985). Moreover, "the plain meaning of the contract is binding upon the court unless the contract by its very terms is inherently ambiguous." *Opalack v. United States,* 5 Cl.Ct. 349, 359 (1984). Furthermore, a "mere dispute over the terms of a contract does not necessarily constitute ambiguity." *Dynamics Corp. of America v. United States,* 10 Cl.Ct. 275, 280 (1986). Indeed, "summary judgment may be appropriate in a case where the contract terms are clear and unambiguous even if one party asserts that a result different from that embodied in the terms was intended." *Steinmetz Elec. Contractors Ass'n v. Local Union No. 58,* 517 F.Supp. 428, 432 (E.D. Mich.1981).

lowing observations are made. As stated above, if the court were to find that the Government's actions in August 1985 were justified as a constructive termination for convenience, plaintiff would not be entitled to recover any breach of contract damages but would be limited to such recovery as is provided by the termination for convenience clause in the contracts. Plaintiff admits that Brady & Brady has been fully compensated for all work actually performed under the contract, and thus, it may well be that plaintiff has received all she is entitled to receive under the termination for convenience clause. However, if upon termination, the contract limited the government's liability to payment for services already rendered, which seems to be the situation in the case at bar, then the government offered only illusory consideration for the requirements contracts. Under such a termination for convenience clause, the government could terminate a contract with impunity, a result rejected in the *Torncello* case, *supra*. *See also Biener*, *supra*, 17 Cl.Ct. at 811–12. Accordingly, it would appear that the termination for convenience clause in the contracts at issue would not be available to the government as a limitation on plaintiff's recovery of damages.

If the court were to find that defendant's August 1985 actions were not justified as a constructive termination for convenience, plaintiff may be entitled to recover damages in the form of net anticipated profits, *i.e.*, the contract price minus costs and expenses that would be incurred in performing the contract. *See Restatement (Second) of Contracts*, section 347, which in the case of a breach of contract provides, in essence, for recovery of the contract price less expenses that would have been incurred during performance. Plaintiff claims that the total contract price would have exceeded $50,000 if fully performed. She arrives at that figure by adding twenty-five percent to defendant's estimate of $40,382.47, as the total cost of the three contracts in issue. Plaintiff claims that, in her past dealings with defendant, the court has underestimated its court reporting needs by approximately twenty-five per-

cent each year. This does not appear, at this time to be a particularly persuasive argument. Plaintiff must establish with reasonable certainty that defendant would have ordered $50,000 worth of plaintiff's services during the term of the contracts, as required by section 352 of the *Restatement (Second) of Contracts*. Otherwise, the calculation of damages will likely begin with the defendant's estimate of $40,382.47, minus costs and expenses. In addition, defendant correctly points out that plaintiff can only recover that portion of net anticipated profits that would have been earned after defendant's August actions.

If plaintiff is found to have breached the contracts, however, and the breach is material, defendant's August actions may be excusable if they are found to be a breach, since they are subsequent to plaintiff's breach. Plaintiff would not be entitled to recover damages under these circumstances. The applicable rule is set forth in comment (a) of section 237 of the *Restatement (Second) of Contracts* as follows. A material failure of performance by one party has the effect of either preventing performance of the other party's duties from coming due, or discharging the other party's duties if the failure of performance has not been cured during the time which performance can occur. The issue of whether plaintiff has materially breached the contracts is for the court to decide after a full trial on the merits.

Plaintiff contends, however, that Brady & Brady's breach, if any, was caused by defendant's failure to adhere to the contract terms. Therefore, if defendant is found to have committed a breach by failing to give plaintiff twenty-four hours minimum advance notice of its need for court reporting services, or by failing to give plaintiff notice and an opportunity to correct transcription errors, then plaintiff's breach, if any, may be excusable. Too, defendant's breach in this regard must be some relationship to plaintiff's deficiencies in order to have viability.

█ If either party's breach is excusable, such party may be entitled to recover

damages. A party who has reason to know that the other party's performance will not be forthcoming is ordinarily expected to stop his own performance to avoid further expenditure. *See Restatement (Second) of Contracts* § 350 comment (b) (1981). The exception to this rule arises when both parties' performances are to be exchanged simultaneously. Where such concurrent conditions exist, and time is of the essence, the failure of both parties to make tender within the time limit operates to discharge the contract, and neither party can thereafter put the other in default. 6 *Corbin on Contracts* § 1258, at 26 (1963). Although the court reporting contracts require defendant to give twenty-four hours minimum advance notice to plaintiff before plaintiff's duty of performance arises, such duties are probably not sufficiently contemporaneous to constitute concurrent conditions. This, however, is a matter better left for trial.

Plaintiff also seeks damages in an amount equal to the sum of defendant's expenditures for transcription services procured from other parties beginning in August or September 1985. As noted above, it is clear that defendant obligated itself to procure all of its court reporting and transcription requirements from plaintiff's firm. However, plaintiff's entitlement to these damages depends on the resolution of several factual issues at trial, including whether plaintiff breached the contracts.

*Conclusion*

The above discussion indicates that not all of the issues involved in this litigation can be disposed of on the basis of summary judgment. Partial summary judgment is granted in defendant's favor on the issue of whether ESR recording of all court proceedings, both judicial and non-judicial, are outside the scope of these contracts. This holding serves to preclude any recovery by plaintiff for the period October 17, 1985—June 12, 1986. However, the issues of whether plaintiff breached the contracts, and whether defendant can defend its actions by a constructive termination of the contracts for convenience are matters left for trial as they are not amenable to resolution by summary judgment. As the above

discussion indicates, both sides have favorable and unfavorable positions on the remaining issues. Such circumstances warrant, in the court's view, consideration of settlement as a basis for disposition of the litigation. Counsel are encouraged to give consideration to settlement which may well serve the interests of all parties and the court relative to the expense, costs and time involved in trial. The parties are to advise the court within thirty (30) days of the date of this opinion as to the possibility or probability of settlement. If settlement is improbable, counsel shall, within forty-five (45) days of the date of this opinion provide the court, after discussion with each other, of a schedule of proceedings looking toward trial of this matter. This schedule shall include dates as to when document lists and witness lists are to be exchanged, the filing of pretrial proposed findings of fact and briefs and replies thereto, and trial date(s).