**YOUNGSTOWN STEEL EQUIPMENT SALES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 125–86C.

United States Claims Court.

May 29, 1990.

David C. Hanson, Pittsburgh, Pa., for plaintiff. Webb, Burden, Ziesenheim & Webb, of counsel.

Kathleen N. Coleman, with whom were Asst. Atty. Gen. Stuart M. Gerson, David M. Cohen, and Stephen J. McHale, Washington, D.C., for defendant.

OPINION

BRUGGINK, Judge.

This action arises out of a contract between Youngstown Steel Equipment Sales, Inc. ("YSES" or plaintiff) and the United States Department of Commerce, Economic Development Administration ("EDA" or Government), in which YSES agreed to assist in the liquidation of certain steel equipment which had been peacefully seized by EDA. The dispute is whether plaintiff is entitled to commissions under the contract. YSES asserts that it is owed a 17.5% commission on a purported $2.875 million offer for the equipment. In addition, plaintiff asserts that EDA withdrew some or all of the equipment from sale and that, under the contract, such withdrawal entitles YSES to a 10% withdrawal fee on the value of the equipment. After consideration of the evidence produced at trial and of the post trial briefing, the court concludes that plaintiff is not entitled to either commission.

## BACKGROUND

In 1980, Youngstown Steel Corporation ("YSC"), an enterprise unrelated to plaintiff, received an $8.75 million loan from EDA for the purpose of building a small steel mill, known as a mini-mill, in the vicinity of Youngstown, Ohio. As collateral for the loan, EDA took a security interest in, among other things, YSC's steel making machinery and equipment. In March of 1982, YSC defaulted on the EDA loan, and EDA seized certain YSC assets, including a 17 foot electric furnace, a 4–strand continuous caster, and a rolling mill. These three pieces constituted the basic elements of a mini-mill. In addition, EDA acquired a railroad spike mill and an entire non-operating rolling mill.

Because of the depressed state of the steel industry in the United States in the early 1980's, EDA determined that it would need the assistance of a recognized steel equipment liquidator in disposing of the assets it had acquired. To that end, EDA contracted for the services of Joseph H. Towell. Towell had been a full-time employee of EDA from March of 1979 until September of 1981 at the Office of Business Loans, and had experience with liquidation of steel equipment. According to Robert Fastov, former Deputy Chief Counsel at EDA, who testified for the Government, Towell's position had been eliminated because the steel industry was shrinking. His services were still necessary in connection with YSC and other projects, however, and Towell was therefore hired as an independent contractor.[1]

In August of 1982, Towell made his first contact with Donald A. Casey, President of Casey Equipment Corporation ("CEC"), a Pennsylvania corporation involved in the business of purchasing, rebuilding, reconditioning, and selling used steel equipment.[2] Casey was then, and is today, also President of plaintiff YSES, a CEC affiliate company in the business of appraising and liquidating steel mill equipment.[3] Casey is the majority shareholder of both YSES and CEC.

Towell undertook negotiations with Casey during August, September, and October of 1982. Towell was assisted by Art Hooker, a line attorney for EDA. Hooker was supervised by Fastov. Hooker's role was to prepare drafts of the EDA–YSES agreement for Fastov's approval.

During negotiations, Casey had difficulty getting EDA's agreement, through Towell and Hooker, on two aspects of the contract. First, Casey was adamant about receiving a 17.5% commission on all sales. Casey testified that he had received a 17.5% commission on a previous contract, and that he did not want to set an unfavorable precedent when negotiating future contracts. EDA thought this commission was too high, and that it might strengthen a potential claim that a sale was not commercially reasonable. A second area of disagreement concerned withdrawal fees. Casey wanted a fee of 10% of the value (which would be determined as specified by contract) of any equipment withdrawn from sale for any reason. Casey stated that he sought this provision to protect CEC's initial financial outlays for advertising and

---

**1.** Towell's duties were outlined in his contract. Under section 1 of that contract, Towell was to "perform such service and render such periodic reports in connection with the projects administered by the Office of Portfolio Administration of EDA as the Director of the Office of Business Loans, or his designee, may from time to time request." There is no document in the record which outlines Towell's specific duties, or his authority, with respect to the YSC project specifically. Fastov testified that none of EDA's printed delegations of authority would generally go down as low as Towell. Towell's contract contained a general restriction on authority: "Towell is not the agent or representative of EDA ... and has no power to enter into any contract,

agreement, understanding, commitment, undertaking or representation on behalf of [EDA]."

**2.** Casey stated that Miles Sullivan, Towell's superior at the Office of Business Loans, told him that Towell had Sullivan's "full confidence" and that Towell was "the only person [Casey] would have to communicate with." Casey testified that Sullivan led him to believe that Towell would make all the decisions concerning YSES's involvement with EDA.

**3.** YSES was formed when CEC was involved in the liquidation of the assets of Youngstown Sheet and Tube Company, a company unrelated to both YSC and YSES.

other costs. EDA wanted the 10% withdrawal fee to apply only if EDA first acquired the equipment at a foreclosure sale conducted pursuant to the contract, and thereafter decided to withdraw it from sale.

Four drafts of an agreement were generated during negotiations.[4] In all four drafts, the stated commission was 17.5% "on all sales effected pursuant to [this contract]." This comported with Casey's desire. Early draft versions of the contract had also contained a blanket 10% withdrawal fee, as requested by Casey. Casey testified that after his third meeting with Towell and Hooker in late October of 1982, he felt that he had an "agreement in principle" with Towell according to these terms, and that he was told, "based on a handshake," to begin working to dispose of the YSC assets. At this time, the first three drafts of the contract had been generated.

In late November, Hooker and Towell presented Casey with a final contract. It was, in fact, the fifth version of the contract.[5] This version, like previous ones, had been reviewed and edited by Fastov and his superiors at EDA. Casey stated that Towell and Hooker told him it was identical to the previous drafts. Casey reviewed the contract. As to the services YSES was to perform in connection with the disposal of the YSC assets seized by EDA, this final version of the contract had not changed. Section 1 of the contract described these services, as set out in relevant part below:

1. SALES [YSES] will perform the following services for EDA:

   a. SALES will review the existing inventory, prepare an appraisal of the machinery, equipment, spare parts and related property, ... and deliver such appraisal to EDA.... Such appraisal will list the Machinery and will show SALE's opinion, in detail reasonably satisfactory to EDA of:

      (i) the reasonable minimum cash price which EDA should expect to obtain

through negotiated sale ... of the Spike Mill and the Monongahela Property [the non-operational rolling mill];

      (ii) the recommended upset prices upon which EDA should determine protective bids to be made by it at a public sealed bid or auction sale or sales....

\*   \*   \*   \*   \*   \*

b. Sales will advise EDA in connection with the sale of the property in order that such sale shall be conducted in a commercially reasonable manner in accordance with normal steel industry disposition practices, and in particular to:

      (i) determining the most advantageous type (negotiated sale, sealed bid sale, or auction sale or otherwise), ... of sale....

\*   \*   \*   \*   \*   \*

In addition to providing that YSES would advise EDA in connection with the disposal of assets to third parties, the contract provided, at Section 2, for what would occur if EDA acquired any of the property pursuant to foreclosure sale. *See* Section 1(a)(ii) (EDA would submit upset bids). If EDA acquired the property outright in that fashion, it would retain YSES to assist in the resale of property thus acquired, under terms set forth in that section. Paragraph c of Section 2 stated that EDA could withdraw the equipment from sale. Section 10 of the contract was a general withdrawal provision: "EDA reserves the right in its absolute discretion to withdraw the property ... from sale...."

Section 4 of the final contract governed compensation. It stated that a 17.5% commission would be paid "on all sales effected pursuant to Section 1 hereof...." Section 4(b)(i). This was consistent with the previous drafts of the contract and with Casey's understanding and desires. The 10% withdrawal fee (found at 4(b)(iii)), however, was not consistent with the previous drafts of the agreement which Casey had seen. It

---

4. The four preliminary drafts were between EDA and CEC. The final was between EDA and YSES.

5. Casey testified that he never saw the fourth version. The fourth version of the contract was introduced into evidence by the Government at trial. It was virtually identical to the fifth and final version presented to Casey.

stated that the 10% withdrawal fee would only apply to "[m]achinery withdrawn by EDA from sale pursuant to Section 2 hereof." Casey testified that when he read the new withdrawal provision, he was very upset because he recognized it to be contrary to the previous drafts. He said he was also offended because YSES had begun working based on the understanding of a flat 10% withdrawal fee. He refused to sign the contract. Casey testified that when he had Hooker and Towell read the provision over, it seemed as though they only then noticed that the provision had been changed. The three discussed what the provision meant, and Casey testified that they found it "a bit ambiguous" because they were not sure whether the "pursuant to Section 2" language in 4(b)(iii) referred to Section 2 generally or only to paragraph c of Section 2. Casey testified that if the language was referring to Section 2 generally, that would be unacceptable. If however, the language was referring to 2(c) only, Casey would be satisfied.

According to Casey, after Towell and Hooker discussed the meaning of the provision between themselves, they concluded that, in effect, Casey would be assured of being eligible for his 10% commission because a foreclosure sale was already planned for January, and by the time YSES would have to face the meaning of Section 4(b)(iii), the equipment would already have been foreclosed upon. That was unacceptable to Casey. What was important to him was the intent of the contract. He therefore asked Hooker and Towell whether it was the intent of the contract that YSES get the 10% withdrawal fee if EDA withdrew the equipment for any reason. Both said yes. With this understanding, Casey signed the agreement. It is dated November 19, 1982. Casey stated that this was his first contract with the federal government.

Two pieces of litigation related to YSC were ongoing during the time when the EDA–YSES agreement was in effect. On November 11, 1982, eight days before the final EDA–YSES agreement had been signed, the Department of Justice ("DOJ"), on behalf of EDA, filed a complaint in the United States District Court for the Western District of Pennsylvania against YSC and its principles, as well as against Lang Machinery Company. On January 13, 1983, a Chapter 7 bankruptcy petition was filed against YSC in the Bankruptcy Court for the Northern District of Ohio.

The district court litigation impacted on the EDA–YSES agreement. The complaint alleged common law fraud and violations of the False Claims Act, and sought to recover the monies paid to YSC under EDA's original loan. Most critical to the EDA–YSES agreement was Count III of the complaint, which included a request by the Government for a declaratory judgment that EDA's proposed plan of sale of YSC's assets was commercially reasonable under the Uniform Commercial Code. On December 13, 1982, the Government moved for summary judgment on Count III, accompanying that motion with an affidavit from Donald Casey and a proposed plan of sale.

DOJ moved on March 10, 1983 for an expedited hearing. However, a hearing was not held until late July of 1983. By this time EDA had already sold the spike mill by sealed bid, with YSES's assistance. (YSES ultimately received a 17.5% commission on this sale.)

On August 3, 1983, the district court entered a declaratory judgment that the sale of the YSC spike mill by sealed bid was commercially unreasonable and that EDA had contractually obligated itself to pay an excessive commission to YSES. In addition, in its finding of fact, the court found that a negotiated sale is the preferred method for attempting to dispose of steel mill equipment, and that it is the commercial practice of dealers in the steel mill industry to dispose of equipment in that manner. It found, however, that sealed bids would be appropriate if negotiated sales yielded offers below the appraised value of the property. On August 25, 1983, Towell wrote to Casey requesting that YSES, in accordance with the district court's declaratory judgment, proceed to attempt to dispose of the remainder of the YSC assets on a negotiated sale basis.

Casey by this time had already begun negotiations with Multi Systems International, Inc. ("MSI") for the sale of the three pieces of equipment which comprised the mini-mill. MSI is a company involved in international trade, with representatives in over 100 countries. Doyle Brewington, MSI's Chairman and 100% stockholder, had heard of the mini-mill equipment through one of YSES's advertisements, and was interested because MSI had potential customers for such equipment in Shanghai, China, specifically the Shanghai Bureau of Metallurgical Industry ("the Chinese"). Brewington made contact with Casey early in 1983, and arrangements were made for inspecting the equipment. Brewington made the initial inspections himself. Later, a delegation representing the Chinese examined it. A videotape of the equipment was also made for the Chinese. On September 2, 1983, Mr. Gu Deji, a Vice Director of the Shanghai Bureau of Metallurgical Industry, wrote to MSI stating that it intended to buy YSC's continuous caster, but that a final decision would be made on September 20 if the details of the transaction were received from MSI by September 15, 1983.

On September 8, 1983, MSI wrote CEC offering $2.875 million for the mini-mill equipment—$400,000 for the continuous caster, $600,000 for the electric arc furnace, and $1,875,000 for the rolling mill. It is undisputed that MSI did not have a firm deal with the Chinese at this time. MSI made the offer on its own behalf. MSI had no intention of taking possession, however, and made the offer on the assumption that the Chinese would be the ultimate customer.

MSI's September 8 offer to CEC stated explicitly that it was on a "where is, as is" basis. The EDA–YSES contract required that all sales be on such a basis. On the same day that MSI made its offer to purchase the mini-mill equipment, MSI also offered to pay CEC $2.5 million if it would refurbish the same three pieces of equipment that were the subject of the offer to purchase. Specifically, MSI offered to pay $850,000 to have CEC refurbish the continuous caster, $150,000 for the arc furnace, and $1.5 million for the rolling mill. Brewington testified that the condition of the equipment was poor, and that total refurbishing would be necessary to make the equipment operational. It is undisputed that the Chinese would not have been interested in the equipment if it were not in running order. Brewington testified, however, that the offer to purchase the equipment was not tied to Casey's refurbishing it, and that if Casey would not do the refurbishing, MSI would look elsewhere for those services. Brewington stated that he expected the September 8 offer to purchase the YSC assets to be legally binding on MSI if accepted.

One other offer was made by MSI to CEC on September 8, to purchase a non-YSC mill for $1.65 million. CEC promptly rejected that offer. It subsequently offered a different mill to MSI, but no sale was ever consummated as a result of these discussions.

MSI's offer for the mini-mill equipment stated that payment would be made with a 10% down payment and an irrevocable confirmed letter of credit on a "U.S.A. first-class bank against on-board railcar shipping documents showing port of embarkation." Brewington explained this arrangement at trial. He stated that the letter of credit would be honored when the equipment was on board railroad cars en route to China. He also stated, however, that according to his discussions with the Chinese the equipment would not be shipped until a representative of the Chinese approved the refurbishing. Payment on the letter of credit therefore depended on approval of the refurbishing by the Chinese.

The arrangement between MSI and the Chinese was not a straight cash deal. That arrangement, as described by Brewington, also impacted on the MSI offer to Casey. Brewington testified that because the Chinese did not have enough foreign currency reserves to purchase the equipment from MSI outright, the Chinese were to buy the refurbished equipment from MSI with 20% in cash and 80% in titanium. Brewington testified that MSI would turn the titanium into cash by finding buyers for the titani-

um in the United States.[6] These potential buyers would put up irrevocable letters of credit for the purchase price of the titanium. Brewington testified that MSI would give these letters of credit to its bank, and that its bank would use them as "back to back" letters of credit for YSES. In other words, the letter of credit referred to in MSI's offer to CEC would be generated by the potential buyers of titanium. This arrangement was not revealed in the MSI offer to CEC. Brewington testified, "they have no reason to know how we are doing it or why we are doing it. All they are advised is that we are going to pay by letter of credit. We handle the rest."

Anthony Powell, Vice President of CEC, responded to MSI's September 8 offer by letter dated September 12, 1983. That letter stated that MSI should send a purchase order for the continuous caster in the amount of $450,000, the electric furnace for $600,000, and the rolling mill for $1,825,-000. MSI's September 8 offer for the rolling mill had been $1,875,000. MSI's September 8 offer for the continuous caster was for $400,000.[7] Powell's letter also stated that EDA had to be presented with an irrevocable and confirmed letter of credit for the purchase price of each of these items, 10% thereof payable within 60 days of receipt of the letter of credit, and the balance payable upon presentation to Mellon Bank N.A., Pittsburgh, Pennsylvania, of shipping receipts, "F.O.B. truck or rail" Youngstown, Ohio, within a period not to exceed 180 days. The letter ended, "Please be advised that we are not extending a hold to MSI based on the price offered to Casey Equipment. We will however extend a

first refusal through the month of October while awaiting your letters of credit."

Towell testified that he was very much in favor of the sale to MSI. MSI's offer exceeded an appraisal performed for EDA by Alico Engineers and Appraisers, Inc. before the equipment was seized. That appraisal valued the mini-mill assets at $1.18 million if sold in the short term and $2.204 million if sold over a longer term. Towell testified that the MSI offer also exceeded Casey's expectations, as revealed in his initial submissions of minimum prices as required by the contract. Further, Towell was pleased with the MSI deal because it would provide a quick solution to disposal of a large part of the assets. Towell also testified that he felt the MSI deal would be commercially reasonable, and would conform to the district court's declaratory judgment.

Towell and Hooker met with Peter Lancaster, an attorney from DOJ, and Fastov, on September 26, 1983, to discuss the MSI deal. As Deputy Chief Counsel, Fastov was in charge of eight to ten attorneys, including Hooker. Fastov oversaw the legal aspects of several hundred EDA loans, and his approval was necessary, along with the Chief Counsel's, for the disposition of YSC's assets according to the EDA–YSES agreement.[8] Fastov stated that his main concern with any deal to dispose of the YSC assets was, in light of the district court's declaratory judgment, whether the sale would be commercially reasonable. Fastov also stated that the trustee in bankruptcy had been "pressuring," and that he therefore preferred a straight cash deal. Fastov testified that after this meeting he still had many unanswered questions re-

6. The value MSI would give the Chinese for their titanium would be the price which buyers would be willing to pay for it, less $2.00 per ton.

7. Brewington was not cross examined directly on this apparent difference in price. A letter to Casey from Brewington, dated September 8, regarding the budgets available for steel equipment, lists the same prices as Powell's letter. Brewington was cross-examined about this letter. Brewington stated that this was a confidential document on how funds were budgeted, and was adamant that the September 8 offer is the only relevant document.

8. Fastov stated that he did not delegate to Hooker the authority to bind EDA. Fastov stated further that, as Deputy Chief Counsel, he did not have the authority to make such a delegation in this case. The reason, he explained, was that the YSC affair had received much national attention and had become controversial, and it was EDA's policy with respect to controversial matters that the Chief Counsel make all final decisions. Fastov testified that this policy was expressed in writing. However, such a writing was not introduced.

garding the MSI deal, that it was all "pretty vague stuff." He testified that in his view price was not just a function of the numbers involved, but also of such things as timing of receipt of the money, the source of the money, who the "players" were, the net receipt, and any contingencies. He also stated that for a variety of reasons he was anxious to dispose of the YSC assets. Fastov was uneasy because the YSC property was located at four different sites, none of which were owned by EDA. Fastov also felt that the YSC situation was delicate because local citizens were concerned with whether the dismantling of the YSC plant would permanently deprive the community of jobs. Lastly, Towell, whose experience EDA needed, was at that time planning to leave the Government. Fastov testified that in light of what he perceived as a complicated situation, he would have been very happy if he could "cut a deal that would get the Government a reasonable amount of money out of that morass."

On October 3, 1983, at Fastov's request, a meeting was held between representatives of YSES and EDA to discuss the details of the MSI deal. At this meeting, Casey was introduced for the first time to Fastov, and various aspects of the MSI deal, as it then stood, were discussed. Fastov testified that it was at this meeting that he first became aware of Brewington's negotiations with the Chinese. Fastov had never heard of Brewington before, and, further, no one at the meeting seemed to know the specifics of Brewington's negotiations with the Chinese. Fastov made it known at the meeting that this concerned him. Fastov also told Casey of his concern in regard to commercial reasonableness. In particular, Fastov asked Casey if CEC would accept a commission less than 17.5%. Casey was unwilling. One of Fastov's greatest concerns was the refurbishing contract. This arrangement made him wary for several reasons. He felt that it implicated Section 8 of the contract, which provides that YSES "will not enter into any agreement or understanding with any other party which will provide that SALES will receive any direct or indirect compen-

sation with respect to any sales of Machinery contemplated by this Agreement...." Fastov wanted to know, therefore, exactly what CEC was making on the contract. The refurbishing contract also concerned him because there would be approximately a six month period after sale during which the machinery would have to remain in place for refurbishing. EDA did not own the property on which the equipment was stored, and the cost of keeping the equipment under guard would subtract from EDA's net gain. He was also concerned that an injunction against the sale might be brought during the six month period, either by local citizens offended by the sale of the equipment to the Chinese, or by Lang Machinery Company, one of the defendants in the district court litigation. Fastov testified that these were not fabricated concerns; that he had experienced these types of problems on more than one occasion at EDA. According to Fastov, Casey assured him the deal would be kept quiet.

Fastov had other lesser concerns. The MSI deal only involved what Fastov referred to as "the big stuff." Ideally, buyers interested in the larger equipment would be persuaded, as part of the deal, to purchase some of the less valuable equipment not covered by the MSI offer. In addition, Fastov was not comfortable with MSI's earlier (rejected) offer for a non-YSC asset. He made it clear at trial that he felt this offer was the result of some improper conduct on the part of Casey. It is not clear from Fastov's testimony, however, whether this was mentioned at the October 3 meeting.

At the close of the October 3 meeting, Casey asked EDA to make a decision on the MSI offer within five days because MSI needed a commitment from EDA before it could close a deal with the Chinese. Fastov, in response, asked Casey to send a "rationalization" of the deal, describing it in detail and answering questions raised at the meeting. He told Casey that EDA would then make a decision.

Casey's response letter was dated October 4, 1983. That letter is two and one half pages in length. Although it indicated that

enclosures were included, they apparently were inadvertently left out. Fastov testified that he never saw the enclosures. They were not introduced at trial. In the letter, Casey provided a chronology of events leading up to MSI's September 8 letter. Regarding the refurbishing contract, the letter stated that "[t]he division of equipment and rebuild costs were detailed by Brewington and were not, to the best of our knowledge, influenced by Casey Equipment." Regarding the Chinese deal, the letter stated: "[W]e received several calls from Brewington advising us that he thought he made a deal for the complete package of equipment." The letter did not address MSI's offer for the non-YSC equipment, and contained no other elaborations on the MSI deal. According to Fastov, the letter was not received until October 11 and was, in his view, not responsive.

EDA never granted YSES permission to accept MSI's offer. In a letter dated October 14, 1983 to C. Dale Randall, Deputy Assistant Secretary for Finance at EDA, Casey wrote that CEC had not received permission from EDA to sell the YSC assets, and that therefore, according to the contract, CEC would be invoicing EDA for the 10% withdrawal fee. Casey also wrote that CEC would be invoicing EDA for $36,000 in expenses incurred "for such things as advertising and preparation of equipment for sale." On October 28, 1983, the YSC assets were turned over to the trustee in bankruptcy.

EDA reviewed invoices related to the claim expressed in Casey's October 14 letter for advertising and other expenses. By letter dated December 14, 1983, Fastov wrote Casey informing him that, following EDA review, a check in the amount of $36,516.02 had been ordered to be made to CEC.[9] Including previously honored invoices, EDA paid a total of $66,479.40 to CEC. Of that, $15,452 represented costs for preparing assets for sale, and approximately $50,000 was paid for advertising expenses and advances for security guards. In addition, EDA paid to YSES a total of $48,879.84. Of this, $38,500 represented YSES's 17.5% commission for the sale of the spike mill. The rest was reimbursement for expenses.

Casey was formally notified of EDA's decision to reject the MSI offer by letter from Fastov dated November 2, 1983. In that letter, Fastov stressed that the district court's declaratory judgment virtually required a negotiated sale. This, according to Fastov, "placed ... immeasurably greater [ ] burden on this Agency to establish fairness of price" because the safeguard of public exposure and competitive bids was no longer available. Fastov also explained that the concerns expressed at the October 3 meeting were not alleviated by Casey's October 4 letter, and that accordingly "EDA was not in a position properly to evaluate this proposal." Fastov's November 2 letter also addressed certain portions of Casey's October 14 letter to Randall. Fastov wrote that EDA saw no basis in the contract for the 10% commission. Fastov noted that Section 4(b)(iii) of the contract provided for a 10% withdrawal fee only if machinery was withdrawn from sale pursuant to Section 2. Fastov pointed out that Section 2 was only applicable to machinery which EDA acquired at a foreclosure sale, and that there had been no foreclosure sale. He additionally noted that under Section 2(a), YSES was to submit its recommendation as to minimum prices, and that EDA would establish them, but that EDA had not yet done so. Also, pointing to Section 8 (regarding conflict of interest), Fastov wrote, "[c]learly the arrangements entered into by Casey Equipment with respect to the equipment to be sold to MSI are in direct violation of this provision." Fastov closed the letter by suggesting that Casey discuss the MSI proposal with the trustee in bankruptcy. The court notes that Fastov admitted he never actually saw MSI's September 8 letter to Casey which purported to be the offer, nor did he see an October 5 memo written by Hooker which recommended the MSI deal.

**9.** That letter, however, stated expressly that the payment did not waive EDA's legal position regarding the applicability of the 10% withdrawal fee under the EDA–YSES contract.

Casey met with Stanley Rosen, an auctioneer hired by the trustee in bankruptcy, to discuss the MSI proposal, but could not reach agreement. Apparently, Rosen was unwilling to allow YSES a 17.5% commission. The three items covered by the MSI deal were ultimately sold by the trustee in bankruptcy on May 16, 1984, for $750,000. The bankruptcy court confirmed those sales by orders dated May 22, 1984 and July 11, 1984.

On October 3, 1984, YSES filed a certified claim with the contracting officer. That claim was denied on April 9, 1985, and YSES filed suit in this court on February 26, 1986 under the Contract Disputes Act, 41 U.S.C. §§ 601-13 (1982). In its complaint, plaintiff asserts that it produced a ready, willing, and able buyer in MSI, and that it is therefore entitled to a 17.5% commission on MSI's offer of $2,875,000. Plaintiff also alleges that EDA withdrew the equipment from sale, that the YSES equipment had a value of $4,178,680 at the time of withdrawal,[10] and that YSES is therefore entitled to a 10% commission on $1,303,680, the value of the property remaining. In the alternative, plaintiff seeks 10% on the total alleged value of all the equipment, $4,178,680.

## DISCUSSION

### A. The 17.5% commission.

Plaintiff relies on contract Section 4(b)(i) in arguing that it is entitled to a 17.5% commission on MSI's $2,875,000 offer. That section provides for a commission on "all sales effected" pursuant to Section 1 of the contract. Plaintiff makes an analogy to an exclusive broker contract, under which the broker earns its commission when it presents a ready, willing, and able buyer to purchase on the seller's terms. YSES argues that it presented a ready, willing, and able buyer whose offer was not in conflict with the contract's objective of securing a commercially reasonable sale,

and that EDA therefore had no discretion to reject the offer. Plaintiff contends that the contracting officer was obligated not to act in an arbitrary and capricious manner, a standard which required him to give "fair and honest consideration" to the MSI deal. It cites *Keco Indus., Inc. v. United States,* 203 Ct.Cl. 566, 492 F.2d 1200 (1974), and *Hoel-Steffen Constr. Co. v. United States,* 231 Ct.Cl. 128, 684 F.2d 843 (1982), among other cases, for support. EDA's decision to reject the MSI proposal was arbitrary and capricious because, in plaintiff's view, the November 2 letter rejecting that proposal raised issues unrelated to merits of the MSI deal, and was therefore not based on fair and honest consideration.

■ The court agrees that the relevant test is whether the Government's conduct was arbitrary and capricious. *See Darwin Constr. Co., Inc. v. United States,* 811 F.2d 593, 597 (Fed.Cir.1987) ("there is no doubt that in the exercise of its CDA jurisdiction under 28 U.S.C. § 1491, the Claims Court has held that it is authorized to set aside the decision of a contracting officer where it is established that his decision was arbitrary and capricious") (citing *International Verbatim Reporters, Inc. v. United States,* 9 Cl.Ct. 710, 715 (1986); *Udis v. United States,* 7 Cl.Ct. 379, 387 (1985); *Olympia USA, Inc. v. United States,* 6 Cl.Ct. 550, 554 (1984)). In applying this standard, the inquiry is "whether the procurement agency's decision had a reasonable basis." *Continental Business Enter., Inc. v. United States,* 196 Ct.Cl. 627, 638, 452 F.2d 1016, 1021-22 (1971) (citing *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971)); *see Hoel-Steffen Constr. Co.,* 231 Ct.Cl. at 135, 684 F.2d at 848 ("the 'reasonable basis' test for measuring the validity of a contracting officer's decision has received long standing recognition by this court" (citing *Keco Indus.,* 203 Ct.Cl. at 574, 492 F.2d at 1204)).[11]

---

**10.** CEC's most current submission as to the minimum prices was dated October 5, 1983, and set the minimum price for all the YSC assets in issue at $4,178,680. It is undisputed that EDA never approved this or any other minimum price submitted by CEC.

**11.** The "fair and honest consideration" criteria discussed by plaintiff comes from the *Keco Industries* case, which gave four "subsidiary criteria" which are relevant in determining whether a contracting officer's decision is arbitrary and capricious.

Plaintiff has the burden of showing that there was no reasonable basis for the decision. *Hoel–Steffen Constr. Co.*, 231 Ct.Cl. at 135, 684 F.2d at 848.

Initially, the court is not satisfied that MSI was a ready, willing, and able buyer. MSI may have been ready and willing to buy. It was not, however, able to buy immediately. Brewington admitted that he did not have a firm offer from the Chinese, who, it is undisputed, were the ultimate customers for the YSC equipment. MSI, in turn, was relying on the Chinese for titanium, the buyers of which would put up the letters of credit that formed the basis of payment.

Notwithstanding the question of whether MSI was a ready, willing, and able buyer, plaintiff questions the validity of virtually every reason given by Fastov (at trial and in the November 2 letter) for rejecting the MSI proposal. Regarding Fastov's concern with risk of loss during the six month period, for example, plaintiff argues this was not valid because indemnification against risk of loss was not raised in the October 3 meeting or in the November 2 letter and that, in any event, such a concern could have been dealt with by insurance. While it may be true that insurance could cover this risk, this solution is now only hypothetical. Furthermore, in light of Casey's imposed five-day deadline, EDA at that time certainly had limited opportunity to explore such options.

Plaintiff asserts that Fastov's concern about vandalism of the equipment was also unfounded. The court disagrees. It certainly would be valid for EDA to be concerned with possible vandalism during the six month refurbishing period because during this period EDA would still be the owner of the equipment. EDA had encountered such problems before. Fastov also elaborated on the reason for his concern about vandalism. The Youngstown area was depressed. The steel mill meant work for the local community, and Fastov was concerned that citizens would be angered that the mill was being removed to a foreign country, rather than being sold to an entity that might try to revitalize it in place.

The possibility of the Chinese halting payment if dissatisfied with CEC's refurbishing job was also a legitimate concern. Plaintiff acknowledges that the letters of credit only required payment after the equipment was loaded on rail cars after inspection, but also states, without elaboration, that "no inspection could have interfered with the right to claim against the letters." Without more explanation, the court cannot agree that EDA's concern that payment could be withheld because of dissatisfaction with the refurbishing was groundless. In this respect, the court agrees with Fastov that Casey provided no real assurance. Casey's letter in answer to the questions raised by Fastov at the October 3 meeting did not provide helpful additional information. The only elaboration in that letter on the involvement of the Chinese was that "we received several calls from Brewington advising us that he thought he had made a deal for the complete package of equipment." It is not difficult to understand why EDA found this unresponsive.

The court also cannot fault Fastov for his concern that during the six month refurbishing period there would be costs associated with storing and guarding the equipment. This would reduce EDA's net gain on the sale.

It is not necessary to address each of Fastov's grounds for rejecting the MSI offer. The court is satisfied that Fastov had legitimate grounds for rejecting the offer; there were reasonable bases for the decision. In any event, the real weakness in plaintiff's point by point attack on Fastov's decision is that it ignores the very relevant question of whether, in light of *all* the unanswered questions, EDA's action can be found to have been arbitrary and capricious. When the MSI deal is viewed as a whole, it is clear that, particularly with the five day time constraint, there were significant unanswered questions and unresolved contingencies regarding the arrangement, and these impacted negatively on its overall desirability. The court must conclude

that plaintiff has not met its burden of demonstrating that Fastov's decision had no reasonable basis.[12]

In finding that EDA's rejection of the MSI offer was not arbitrary and capricious, the court does not accept, and in fact rejects, Fastov's repeated innuendo during his testimony that Casey or CEC was involved in some kind of wrongdoing regarding this contract. Casey impressed the court as an honest, forthright businessman accustomed to doing business "on the basis of a handshake." Fastov's attempts to tarnish Casey were groundless and offensive.

**B.   The 10% withdrawal fee.**

■   Under a literal reading of the contract plaintiff is clearly not entitled to the 10% withdrawal fee. Section 4(b)(iii), which created the possibility of a 10% withdrawal fee, states clearly that the fee can only come into play if EDA withdraws the equipment from sale pursuant to Section 2, that is, if EDA first purchases the equipment at a foreclosure sale conducted pursuant to Section 1.[13] There never was a foreclosure sale. EDA's withdrawal of the YSC equipment was pursuant to "its absolute discretion" to do so under Section 10. Section 10 creates no entitlement to a withdrawal fee.

■   Despite the language of the contract, plaintiff makes several arguments to support its claim to the 10% withdrawal fee. Initially, it notes that a substantial up-front effort would have been required by YSES to get the property ready for sale, whether by foreclosure or on a negotiated basis, and contends that the intent of the parties therefore must have been that YSES was to receive the withdrawal fee whether or not the property was first acquired by EDA at a foreclosure sale. In making this argument, plaintiff is apparently suggesting that both parties realized it would be unfair for YSES to incur costs in connection with preparation for sale, and then be deprived of its commission. There is no indication in the record, however, that any representative of EDA held that view or, more importantly, ever agreed to that construction. Further, the contract has a separate provision addressing the types of expenses which plaintiff now alleges were covered by the 10% withdrawal fee. Section 4(c) of the contract states that EDA will pay "(i) the cost of all advertising approved by it in advance, (ii) the direct costs of cleaning, moving *and otherwise preparing* the equipment for sale as approved by EDA in advance,...." (Emphasis added). Indeed, it is undisputed that YSES and CEC together received over $75,-

**12.**  Plaintiff makes an additional legal argument. It cites *John A. Johnson Contracting Corp. v. United States,* 132 Ct.Cl. 645, 132 F.Supp. 698 (1955) for the proposition that the contracting officer cannot abdicate responsibility by taking action which lawyers told him "were, or probably were, the legal requirements of the situation." YSES argues that EDA's actions were improper because Fastov, rather than the contracting officer, made the ultimate decision. This argument was raised for the first time in plaintiff's Post-trial Brief. The *John A. Johnson* case cited by plaintiff involved a situation where the contracting officer made a decision contrary to his original intention because he was "overruled by the commanding officer and influenced by the lawyers." 132 Ct.Cl. at 661, 132 F.Supp. at 706. Here, no showing was made at trial that the contracting officer was in any way persuaded to make a decision against his wishes, or that he even disagreed with Fastov.

**13.**  Plaintiff argues that it is ambiguous whether Section 4(b)(iii)'s reference to a withdrawal made "pursuant to Section 2" is a reference to Section 2 generally, or rather to Section 2(c), which is the subsection within Section 2 which

provides that EDA may withdraw the equipment from sale. Section 4(b)(iii), however, is explicit. It refers to withdrawals made "pursuant to Section 2," not to withdrawals made "pursuant to Section 2(c)." This is, in any event, a distinction without difference. Even though Section 2(c) makes no mention of purchase at a foreclosure sale, it is a subsection of Section 2. There is no need for any greater degree of specificity. Further, there is a general withdrawal provision in Section 10. If 4(b)(iii) were meant to apply to a general withdrawal, as plaintiff appears to be suggesting, 4(b)(iii) would have referred to Section 10, not to Section 2, which presumes a prior purchase at a foreclosure sale. Whether a contract is ambiguous is a question of law, *Favell v. United States,* 16 Cl.Ct. 700, 717 (1989) (citing, *inter alia, United States v. Sacramento Mun. Util. Dist.,* 652 F.2d 1341, 1343–45 (9th Cir.1981)), and the court concludes that no ambiguity exists here. *See Government Sys. Advisors, Inc. v. United States,* 847 F.2d 811, 812 n. 1 (Fed.Cir.1988) (contract interpretation is a matter of law).

000 for costs incurred while the assets were being prepared for sale. Plaintiff has not alleged that it incurred costs beyond those for which it was reimbursed. The court declines to find that the contract should be interpreted, contrary to its language, so that the 10% withdrawal fee serves the purpose of assuring that up front costs are recovered.

Plaintiff also argues that the court should look to the representation which Casey elicited from Towell and Hooker, when the contract was signed, that it was the intent of the parties that plaintiff would be eligible for the 10% withdrawal fee in the event of withdrawal under any circumstance. According to plaintiff, the representations which Towell and Hooker made are admissible under Section 212(1) of the Restatement, entitled, "Interpretation of Integrated Agreements." That section provides: "(1) The interpretation of an integrated agreement is directed to the meaning of the terms of the writing or writings in light of the circumstances...." Note c to that section elaborates: "The rule of Subsection (1) permits reference to the negotiations of the parties, including statements of intention and even promises, so long as they are used to show the meaning of the writing."

The parol evidence rule has long been applied by this court to prohibit evidence of prior or contemporaneous agreements that modify or contradict the terms of a final, written agreement. *See, e.g., Erwin v.*

*United States,* 19 Cl.Ct. 47, 55 n. 4 (1989), and cases cited therein. This principle is consistent with Section 212(1). Section 212(1), as the title implies, is addressed to interpretation of agreements. As made clear by note c, it leaves room for clarification of meaning, not direct contradiction. Indeed, counsel for plaintiff acknowledged during closing argument that the parol evidence rule would exclude the discussions between Casey, Towell, and Hooker regarding the application of the 10% withdrawal fee unless "the provision is ambiguous." If the provision is ambiguous, plaintiff stated, "then the intent of the contract can be considered and we can consider the representations that were made by Mr. Towell and Mr. Hooker." As discussed above, the contract unambiguously provides that a 10% withdrawal fee is applicable only where EDA has purchased the equipment at a foreclosure sale. The representations made by Towell and Hooker squarely contradict this. Indeed, it was Casey who pointed out to Hooker and Towell that the language he ultimately signed was not consistent with his wishes. The parol evidence rule therefore precludes the court from considering the representations made to Casey by Towell and Hooker.[14]

■ Plaintiff argues that even if the contract is construed as written, that is, if the entitlement to the 10% withdrawal fee is conditioned upon EDA's first acquiring the equipment at a foreclosure sale and then

---

14. A necessary implication of plaintiff's argument is that Towell or Hooker, or both, had authority, actual or implied, to bind EDA in contract. *See H. Landau & Co. v. United States,* 886 F.2d 322 (Fed.Cir.1989). Plaintiff does not directly confront this issue. YSES's only reference during briefing to the authority of Towell and Hooker is the assertion in its Post-trial Brief that they had "inherent" authority to negotiate contracts. Nothing is said there about the authority to bind EDA. At post trial argument, plaintiff's counsel stated that Miles Sullivan's comment to Casey that Towell would be Casey's only contact with EDA was "evidence of actual authority." However, neither Hooker nor Towell had express actual authority—Section 6 of Towell's contract states clearly that Towell "is not an agent or representative of EDA ... and has no power to enter into any contract, agreement, understanding, commitment, undertaking, or representation on behalf of [EDA]," and

Fastov stated that Hooker could not have had the authority to bind EDA because the YSC matter was controversial. Regarding implied actual authority, J. Cibinic & R. Nash write, "[a]uthority to bind the Government is generally implied when such authority is considered to be an integral part of the duties assigned to a Government employee." J. Cibinic & R. Nash, *Formation of Government Contracts* 43 (1982); *see Landau,* 886 F.2d at 324 (court cites Cibinic and Nash). Hooker was a line attorney. His role in the EDA–YSES negotiations process was to prepare drafts of agreements between EDA and YSES, which agreements had to be reviewed by Fastov, his supervisor. Fastov stated that if Hooker had told Casey that YSES would be entitled to a 10% withdrawal fee regardless of the circumstances of the withdrawal, Hooker certainly would have been fired. As to Towell, he was not charged with the duty of drafting the contract. That was Hooker's duty.

withdrawing it, this condition, under Sections 229 and 271 of the Restatement, can be excused by the court. Section 229 provides that "to the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange." Section 271 addresses impracticability as a basis for excusing a condition: "Impracticability excuses the non-occurrence of a condition if the occurrence of the condition is not a material part of the agreed exchange and forfeiture would otherwise result." Common to both Section 229 and Section 271 is the requirement that the condition to be excused not be a material part of the agreed upon exchange, and that there be forfeiture if the condition is not excused.

The Restatement test for whether a condition is material is whether the condition materially affects the value received or the burden of risk assumed.[15] Here, excuse of the precondition of a foreclosure sale would materially affect value. The Government would be obligated to pay a 10% withdrawal fee, something which it had specifically refused to do in the absence of its own purchase at a foreclosure sale. For the same reason, excuse of the foreclosure sale would also affect the burden of risk. The Government had not bargained for the risk of paying a withdrawal fee under all conceivable reasons for withdrawal. If, for example, it was dissatisfied with the broker's progress toward a sale, it could, without obligation to pay a fee, withdraw the equipment.

In addressing materiality, plaintiff, citing *Eastern Illinois Trust & Savings Bank v. Sanders*, 631 F.Supp. 1393 (E.D.Ill.1986), *aff'd*, 826 F.2d 615 (7th Cir.1987),[16] urges that the test for whether a condition is a material part of an agreed upon exchange is whether excuse of the condition would operate to defeat the bargained-for objectives of the parties. Plaintiff contends that the parties, at the time the contract was executed, did not contemplate the district court's ruling that the Government's proposed plan for a negotiated sale was commercially unreasonable and that negotiated sale was the preferred method of sale. This ruling, in plaintiff's view, eliminated the need and desirability of a foreclosure sale. Plaintiff argues that the primary objective of the parties—to effect a commercially reasonable sale—would therefore not be defeated by excuse of the condition that EDA purchase the equipment at a foreclosure sale.

The record reveals that EDA was concerned about YSES's fee. Fastov stated that EDA did not want a blanket 10% withdrawal fee because in the past EDA had problems obtaining performance. EDA thus took the deliberate step of imposing the foreclosure sale condition during contract negotiations. The foreclosure condition, therefore, was a material part of EDA's overall concern about commercial reasonableness and retaining control over its broker.

With respect to whether forfeiture would result from enforcement of the foreclosure condition, the comments to both Section 229 and Section 271 define forfeiture the same way, as "denial of compensation that results when the obligee loses his right to the agreed exchange after he has relied substantially, as by preparation or performance on the expectation of that exchange." Restatement § 229 comment b, § 271 comment a. As discussed above, the contract provided for reimbursement of all outlay expenses, and YSES was not denied compensation for them. There was thus no forfeiture. Neither of the two requirements for application of Restatement Sections 229 and 271 are therefore met.

In arguing that it should be entitled to a 10% withdrawal fee, plaintiff is in essence

---

**15.** The comments associated with both those sections provide that a condition is a material part of an agreed exchange where, under § 84 of the Restatement, the condition could have been excused by a promise to perform. Restatement §§ 229 comment c, 271 comment b. Under § 84, a condition cannot be excused by such a promise if that condition materially affects the value received or the burden of risk assumed. Restatement § 84 comment c.

**16.** *Eastern Illinois Trust* addresses materiality of a breach of contract, not materiality of a condition.

asking that the contract be rewritten. The court either would have to add a provision to provide for an across-the-board 10% withdrawal fee, or move the 10% withdrawal fee from Section 2, which never came into play, into Section 1. Sections 229 and 271 cannot be employed for such broad a purpose, and the court finds no other basis for deviating from the contract as written. Plaintiff is therefore not entitled to a 10% withdrawal fee.

## CONCLUSION

In reaching the conclusion that plaintiff cannot recover, the court is not unmindful of the fact that YSES made a good faith effort to fulfill its side of the bargain. It diligently worked to provide a buyer. If EDA had agreed to the MSI proposal, and if it had been performed without mishap, considerably more would have been recovered for the assets than was obtained by the trustee. While the court can admire YSES's competence and sympathize with its frustrations in dealing with the Government in this case, it is constrained, nevertheless, to conclude that EDA was not arbitrary and capricious in rejecting the MSI offer, and that EDA did not withdraw the YSC collateral pursuant to Section 2 of the contract. Plaintiff therefore is not entitled to a 17.5% commission or a 10% withdrawal fee. The clerk is directed to dismiss the complaint. No costs.